**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**
www.flmb.uscourts.gov

IN RE:                                                    Chapter 11 Cases

TP BRANDS WORLDWIDE INC.[1]                   Case No. 8:25-bk-08424-CED
                                                         Lead Case

                                                         *Jointly Administered with*
TP BRANDS INTERNATIONAL INC.              Case No. 8:25-bk-08425-CED
PREMFLOOR, INC.,                                  Case No. 8:25-bk-08427-CED

        Debtors.
_____/

**FIRST AMENDED DISCLOSURE STATEMENT FOR JOINT PLAN FOR**
**TP BRANDS WORLDWIDE INC. AND ITS DEBTOR AFFILIATES**


Dated: March 13, 2026.              BERGER SINGERMAN LLP
                                            *Counsel for the Debtors and Debtors-in-Possession*
                                            101 E. Kennedy Boulevard, Suite 1165
                                            Tampa, FL 33602
                                            Tel. (813) 498-3400
                                            Fax (813) 527-3705

                                            By:  */s/ Edward J. Peterson*
                                                    Edward J. Peterson
                                                    Florida Bar No. 0014612
                                                    epeterson@bergersingerman.com
                                                    Clay B. Roberts
                                                    Florida Bar No. 116058
                                                    croberts@bergersingerman.com

---

[1] The address of the Debtors is 2021 51st Avenue East, Unit 109, Palmetto, FL 34221.  The last four digits of the Debtors' federal tax identification numbers are: TP Brands Worldwide Inc. (5200); TP Brands International Inc. (4195); and Premfloor, Inc. (6672).

35584519-11

THIS DISCLOSURE STATEMENT (THE "DISCLOSURE STATEMENT") MAY NOT BE RELIED ON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE JOINT PLAN OF FOR TP BRANDS WORLDWIDE INC. AND ITS DEBTOR AFFILIATES (THE "PLAN OF REORGANIZATION" OR THE "PLAN"), AND NOTHING CONTAINED IN THIS DISCLOSURE STATEMENT WILL CONSTITUTE AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY, OR BE ADMISSIBLE IN ANY PROCEEDING INVOLVING THE DEBTORS OR ANY OTHER PARTY, OR BE DEEMED CONCLUSIVE ADVICE ON THE TAX OR OTHER LEGAL EFFECTS OF THE PLAN ON HOLDERS OF CLAIMS AGAINST OR INTERESTS IN THE DEBTORS.

THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED BY THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE SECURITIES COMMISSION, NOR HAS THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE SECURITIES COMMISSION PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN.

THE DESCRIPTION OF THE DEBTORS' PLAN OF REORGANIZATION CONTAINED IN THIS DISCLOSURE STATEMENT IS INTENDED AS A SUMMARY ONLY AND IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PLAN ITSELF. **EACH CREDITOR AND HOLDER OF AN INTEREST SHOULD READ, CONSIDER AND CAREFULLY ANALYZE THE TERMS AND PROVISIONS OF THE PLAN.**

THE SOLICITATION OF ACCEPTANCES OF THE PLAN OR THE GIVING OF ANY INFORMATION OR THE MAKING OF ANY REPRESENTATION OTHER THAN AS CONTAINED IN THIS DISCLOSURE STATEMENT AND THE EXHIBITS OR DOCUMENTS ATTACHED HERETO OR INCORPORATED BY REFERENCE OR REFERRED TO HEREIN IS NOT AUTHORIZED BY THE DEBTORS, AND IF GIVEN OR MADE, SUCH INFORMATION OR REPRESENTATION MAY NOT BE RELIED UPON AS HAVING BEEN AUTHORIZED BY THE DEBTORS. SUCH ADDITIONAL REPRESENTATIONS SHOULD BE REPORTED TO COUNSEL FOR THE DEBTORS, WHO IN TURN WILL DELIVER SUCH INFORMATION TO THE BANKRUPTCY COURT FOR ACTION AS MAY BE DEEMED APPROPRIATE. THE DELIVERY OF THIS DISCLOSURE STATEMENT WILL NOT UNDER ANY CIRCUMSTANCES IMPLY THAT THE INFORMATION HEREIN IS CORRECT AS OF ANY TIME SUBSEQUENT TO THE DATE HEREOF. CREDITORS AND HOLDERS OF INTERESTS ARE ENCOURAGED TO REVIEW THE BANKRUPTCY DOCKET IN ORDER TO EVALUATE EVENTS WHICH OCCUR BETWEEN THE DATE OF THIS DISCLOSURE STATEMENT AND THE DATE OF THE CONFIRMATION HEARING. **ALL CREDITORS THAT ARE ENTITLED TO VOTE ARE ENCOURAGED TO READ AND CAREFULLY CONSIDER THIS ENTIRE DISCLOSURE STATEMENT, INCLUDING THE PLAN OF REORGANIZATION AND THE MATTERS DESCRIBED IN THIS DISCLOSURE STATEMENT, PRIOR TO SUBMITTING A BALLOT PURSUANT TO THIS SOLICITATION.**

IN THE EVENT THAT ANY OF THE CLASSES OF HOLDERS OF IMPAIRED CLAIMS VOTE TO REJECT THE PLAN (1) THE DEBTORS MAY ALSO SEEK TO SATISFY THE REQUIREMENTS FOR CONFIRMATION OF THE PLAN WITH RESPECT TO THAT

35584519-11

CLASS UNDER THE SO-CALLED "CRAMDOWN" PROVISIONS OF SECTION 1129(b) OF THE BANKRUPTCY CODE (11 U.S.C. §1129(b)) AND, IF REQUIRED, MAY FURTHER AMEND THE PLAN TO CONFORM TO SUCH REQUIREMENTS OR (2) THE PLAN MAY BE OTHERWISE MODIFIED OR WITHDRAWN AS PROVIDED THEREIN. THE REQUIREMENTS FOR CONFIRMATION, INCLUDING THE VOTE OF HOLDERS OF IMPAIRED CLAIMS TO ACCEPT THE PLAN AND CERTAIN OF THE STATUTORY FINDINGS THAT MUST BE MADE BY THE BANKRUPTCY COURT, ARE SET FORTH UNDER THE CAPTION "VOTING ON AND CONFIRMATION OF THE PLAN."

APPROVAL OF THIS DISCLOSURE STATEMENT BY THE BANKRUPTCY COURT DOES NOT INDICATE THAT THE BANKRUPTCY COURT RECOMMENDS EITHER ACCEPTANCE OR REJECTION OF THE PLAN, NOR DOES SUCH APPROVAL CONSTITUTE A DETERMINATION BY THE BANKRUPTCY COURT OF THE FAIRNESS OR MERITS OF THE PLAN OR OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT.

**THE DEBTORS BELIEVE THAT THE PLAN IS IN THE BEST INTERESTS OF CREDITORS AND HOLDERS OF INTERESTS. ALL CREDITORS AND HOLDERS OF INTERESTS ARE THEREFORE URGED TO VOTE IN FAVOR OF THE PLAN.** TO BE COUNTED, YOUR BALLOT MUST BE COMPLETED AND EXECUTED AND RECEIVED BY NO LATER THAN THE TIME SET BY THE COURT.

### DISCLOSURE STATEMENT FOR PLAN OF REORGANIZATION UNDER CHAPTER 11 OF THE UNITED STATES BANKRUPTCY CODE

TP Brands Worldwide Inc., TP Brands International Inc., and Premfloor, Inc., as debtors and debtors in possession (collectively, the "Debtors"), submit this Disclosure Statement pursuant to Section 1125 (11 U.S.C. §1125) of the Bankruptcy Code, 11 U.S.C. §101, *et seq.* (the "Bankruptcy Code"), in connection with the solicitation of votes on the Joint Plan for TP Brands Worldwide Inc. and its Debtor Affiliates (the "Plan") from holders of impaired Claims against the Debtors and the hearing on confirmation of the Plan, as scheduled by the Bankruptcy Court.

This Disclosure Statement is subject to the approval of the Bankruptcy Court in accordance with Section 1125(b) of the Bankruptcy Code as containing information of a kind and in sufficient detail adequate to enable a hypothetical reasonable investor typical of the holders of Claims of the relevant Voting Classes (as defined below) to make an informed judgment whether to accept or reject the Plan. Effort has been made to provide meanings of capitalized and other terms used in this Disclosure Statement. Reference is made to the Plan. Terms used in this Disclosure Statement and in the Plan are defined in Article I of the Plan. In the event of a conflict between the definition of any term or any other provision contained in this Disclosure Statement and the corresponding definition or provision contained in the Plan, the definition or provision contained in the Plan shall control.

35584519-11

In the opinion of the Debtors, the treatment of Claims and Interests under the Plan contemplates a substantially greater recovery than that which is likely to be achieved under other alternatives for the reorganization or liquidation of the Debtors. **If the Plan is not confirmed, unsecured creditors may be left with little or no recovery.**

The Debtors believe that confirmation of the Plan is clearly in the best interests of Creditors and Holders of Equity Interests and strongly recommends that Creditors holding Allowed Claims in the Voting Classes vote to accept the Plan.

## PURPOSE OF DISCLOSURE STATEMENT

The purpose of this Disclosure Statement is to provide the Creditors of the Debtors with adequate information to make an informed judgment about the Plan. This information includes, among other things, the history of the Debtors prior to the filing of the Chapter 11 Cases under Chapter 11, the events leading to the filing of the Chapter 11 Cases, a brief summary of significant events to date in the Chapter 11 Cases, and a summary explanation of how the Plan will function.

This Disclosure Statement contains important information about the Plan and considerations pertinent to a vote for or against the confirmation of the Plan. All holders of Claims and Equity Interests are encouraged to carefully review this Disclosure Statement and the Plan.

## VOTING INSTRUCTIONS

### Who May Vote

Only the holders of Claims and Equity Interests that are deemed "allowed" under the Bankruptcy Code and that are "impaired"" under the terms and provisions of the Plan (the "Voting Classes") are permitted to vote to accept or reject the Plan. For purposes of the Plan, there are two (2) impaired Classes of Claims under this Plan, to wit:  Class 3 – Secured Claim of PNC and Class 6 - General Unsecured Claims.  All other Classes of Claims are conclusively presumed to have accepted the Plan, and, thus, not entitled to vote on the Plan.

### How to Vote

Each holder of a Claim in a Voting Class should read this Disclosure Statement, together with the Plan, in their entirety. After carefully reviewing the Plan and this Disclosure Statement, please complete the enclosed Ballot, including indicating your vote thereon with respect to the Plan, and return the Ballot as provided below. Please note that your vote and election cannot count unless you return the enclosed Ballot.

If you are a member of a Voting Class and did not receive a Ballot, if your Ballot is damaged or lost, or if you have any questions concerning voting procedures, please contact Edward J. Peterson, counsel for the Debtors, at (813) 498-3400.

**YOU SHOULD COMPLETE AND SIGN THE ENCLOSED BALLOT AND RETURN IT AS DESCRIBED BELOW. IN ORDER TO BE COUNTED, BALLOTS MUST**

4

**BE DULY COMPLETED AND EXECUTED AND RECEIVED BY NO LATER THAN 4:00 P.M. (EDT) ON THE DATE FIXED BY THE BANKRUPTCY COURT IN THE ENCLOSED ORDER APPROVING DISCLOSURE STATEMENT AND FIXING DATES FOR CONFIRMATION (THE "BALLOT DEADLINE").**

Completed Ballots should be sent by regular mail, hand delivery, or overnight delivery, **SO AS TO BE RECEIVED NO LATER THAN THE VOTING DEADLINE,** to:

Clerk, United States Bankruptcy Court
Sam M. Gibbons United States Courthouse
801 N. Florida Avenue, Suite 555
Tampa, FL 33602

A copy of the Ballot should also be sent to:

Edward J. Peterson, Esq.
Berger Singerman LLP
101 E. Kennedy Blvd., Suite 1165
Tampa, FL 33602

### *Acceptance of Plan and Vote Required for Class Acceptance*

As the holder of an Allowed Claim in the Voting Classes, your vote on the Plan is extremely important. In order for the Plan to be accepted, and thereafter confirmed by the Bankruptcy Court without resorting to the "cramdown" provisions of Section 1129(b) of the Bankruptcy Code as to other classes of Allowed Claims, votes representing at least two-thirds in amount and more than one-half in number of Allowed Claims of each impaired Class of Claims that are voting must accept of the Plan. The Debtors will solicit acceptances only from members of the Voting Classes. The Debtors or their agents may contact you with regard to your vote on the Plan.

To meet the requirement for confirmation of the Plan under the "cramdown" provisions of the Bankruptcy Code with respect to any impaired Class of Claims or Equity Interests which votes to reject the Plan (a "Rejecting Class"), the Debtors would have to show that all Classes junior to the Rejecting Class will not receive or retain any property under the Plan unless all holders of Claims in the Rejecting Class receive, under the Plan, property having a value equal to the full amount of their Allowed Claims.

### *Confirmation Hearing*

The Bankruptcy Court will schedule a hearing to consider confirmation of the Plan (the "Confirmation Hearing"), which may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement of the adjourned date made at the Confirmation Hearing. Any objection to confirmation of the Plan must be in writing and specify in detail the name and address of the objector, the basis for the objection and the specific grounds for the objection, and the amount of the Claim held by the objector. Consistent with Rule 3020(b) of the Federal Rules of

35584519-11

Bankruptcy Procedure, any such objection must be filed with the Bankruptcy Court and served upon each of the following parties, so as to be actually received on or before the deadline set by the Court:

| | |
|---|---|
| Debtors: | Edward J. Peterson, Esq.<br>Berger Singerman LLP<br>101 E. Kennedy Boulevard, Suite 1165<br>Tampa, FL 33602 |
| United States<br>Trustee: | Nathan A. Wheatley, Esq.<br>Office of the United States Trustee<br>170 North High Street, Suite 200<br>Columbus, OH 43215 |

## HISTORY OF THE DEBTORS

The Debtors are manufacturers and importers of their own brands of flooring products, door components, ready-to-assemble kitchen cabinets and bathroom vanities. In addition, the Debtors offer a complete domestic inventory of all of their products and provide services throughout North America. The Debtors' products are available through a network of North American, Canadian, and South American distributors and dealers, and the Debtors offer complete private label programs and OEM services, as well as product development, sourcing, and oversight services.

On August 13, 2025, TP Brands International Inc. entered into an Intellectual Property License Agreement with HW Distribution, LLC ("HW") pursuant to which HW was granted an exclusive license to use certain intellectual property for the marketing and sale of specified products. The Debtors entered into this agreement in order to ensure that there is a revenue stream to fund a reorganization.

## EVENTS LEADING TO THE FILING OF THE BANKRUPTCY
## CASE & PRE-PETITION FINANCIAL PERFORMANCE

**I.      Reasons for Filing Chapter 11 and Debtors' Business Operations**

The Debtors have faced the adverse consequences of rising inflation, high interest rates, and tariffs. The Debtors' secured creditor, PNC Bank ("PNC"), is owed over $3 million based on a loan secured by substantially all of the Debtors' assets.

After evaluating alternatives, the Debtors determined that a chapter 11 filing would provide a venue in which to effectively address their current debts and best serve the interests of their creditors. The Debtors will utilize the chapter 11 process to reorganize their financial affairs and make distributions to creditors efficiently and effectively.

35584519-11

**II.     Debtors' Annual Gross Revenues**

The Debtors' annual gross revenues for 2024, and for the period of January 1, 2025 through November 9, 2025, were as follows:

| Name of Debtor | Gross Income |
|---|---|
| TP Brands Worldwide Inc. | January 1, 2025 through November 9, 2025:  $3,454,393.08<br>January 1, 2024 through December 31, 2024: $8,440,666.21 |
| TP Brands International Inc. | January 1, 2025 through November 9, 2025:  $6,292,872.69<br>January 1, 2024 through December 31, 2024: $3,711,461.00 |
| Premfloor, Inc. | January 1, 2025 through November 9, 2025:  $2,695,372.91<br>January 1, 2024 through December 31, 2024: $9,886,536.00 |

**Post-Petition Financial Performance**

The Debtors continue to operate their business following the filing of the Chapter 11 Cases. Attached as **Exhibit A** is a chart showing the Debtors' financial performance since the filing of the Chapter 11 Cases.  As set forth in the Projections attached as **Exhibit C**, the Debtors anticipate that the income received from performance under the License Agreement will increase over time.

**SIGNIFICANT EVENTS TO DATE IN THE CHAPTER 11 CASES**

On November 10, 2025, the Debtors filed the above-captioned Chapter 11 Cases.

On November 10, 2025, the Debtors filed *Debtor's Motion for Joint Administration* [ECF No. 6], which was granted by Order dated November 12, 2025 [ECF No. 22], thereby jointly administering the Debtors' Chapter 11 Cases under the lead case of *In re TP Brands Worldwide Inc.,* Case No. 8:25-bk-08424-RCT.

On November 10, 2025, the Debtors filed *Debtors' Emergency Motion for Authorization to Pay Prepetition Wages, Salaries, and Other Employee Benefits* [ECF No. 8] (the "Employee Wage Motion").   Following a hearing held on November 13, 2025, the Court entered an *Order Granting Debtors' Emergency Motion for Authorization to Pay Prepetition Wages, Salaries, and Other Employee Benefits* [ECF No. 49], which granted the Employee Wage Motion, and authorized the Debtors to pay the prepetition wages, salaries and commissions owed to the Debtors' employees for the payroll period of November 3, 2025, through November 7, 2025.

**Critical Vendor Motion**

On November 10, 2025, the Debtors filed *Debtors' Emergency Motion for Entry of an Order Authorizing (I) Debtors to Pay Prepetition Claims of Critical Vendors; and (II) Financial Institutions to Honor and Process Related Checks and Transfers* [ECF No. 12] (the "Critical Vendor Motion").  Following a hearing held on November 13, 2025, the Court continued the

35584519-11

hearing to consider the Critical Vendor Motion to December 17, 2025 [ECF No. 41].  Following the December 17, 2025, hearing, the Court further continued the hearing to consider the Critical Vendor Motion to February 2, 2026.

**Cash Collateral Motion**

On November 10, 2025, the Debtors filed *Debtors' Emergency Motion for Authority to Use Cash Collateral* [ECF No. 14] (the "Cash Collateral Motion"), seeking authority to use Cash Collateral (as defined in Section 363(a) of the Bankruptcy Code) to pay operating expenses and the costs of administering these Chapter 11 Cases.  On November 21, 2025, following a hearing held on November 13, 2025, the Court entered an *Interim Order (1) Granting Debtors' Emergency Motion for Authority to Use Cash Collateral on an Interim Basis and (2) Setting Further Hearing* [ECF No. 50] (the "First Interim Cash Collateral Order"), thereby granting the Cash Collateral Motion on an interim basis, authorizing the Debtors to use cash collateral to pay their operating expenses as expressly authorized by the Court, and in accordance with the budget attached to the First Interim Cash Collateral Order, and scheduling a final hearing for December 17, 2025.

On December 12, 2025, PNC filed *PNC Bank's Objection to Debtors' Emergency Motion for Authority to Use Cash Collateral and Motion for Allowance of Affiliate Officer's Salary and Benefits, Effective as of the Petition Date* [ECF No. 63] (the "PNC Objection"), objecting to the use of cash collateral and to the continued payment of Winter's postpetition salary and benefits as requested by the Affiliate Officer Salary Motion (as defined below).

On December 30, 2025, the Court entered a *Second Interim Order (1) Granting Debtors' Emergency Motion for Authority to Use Cash Collateral on an Interim Basis and (2) Setting Further Hearing* [ECF No. 74] (the "Second Interim Cash Collateral Order"), which granted the Cash Collateral Motion on a second interim basis, authorized the Debtors to use cash collateral to pay their operating expenses as expressly authorized by the Court and in accordance with the budget attached to the Second Interim Cash Collateral Order, and scheduled a final hearing for February 2, 2026.

On December 31, 2025, the Court entered an *Order Setting Trial* [ECF No. 77], which scheduled trial for February 2, 2026, to consider the Cash Collateral Motion and Affiliate Officer Salary Motion (as defined below), and set various deadlines for the Debtors and PNC to exchange witness lists and exhibits, file a joint stipulation of undisputed facts, and complete discovery in advance of the trial.  Prior to the trial on the Cash Collateral Motion, the Debtors and PNC came to a global resolution of issues with the Plan, the Cash Collateral Motion, the Affiliate Officer Salary Motion, and all other issues in the case, as set forth in the Settlement Term Sheet.

On February 6, 2026, the Court entered a *Third Interim Order (1) Granting Debtors' Emergency Motion for Authority to Use Cash Collateral on an Interim Basis and (2) Setting Further Hearing* [ECF No. 94], which approved the Cash Collateral Motion on a third interim basis, pending a final hearing on March 25, 2026.

**The Affiliate Officer Salary Motion**

8

35584519-11

On November 10, 2025, the Debtors filed *Debtors' Emergency Motion for Allowance of Affiliate Officer's Salary and Benefits, Effective as of the Petition Date* [ECF No. 10] (the "Affiliate Officer Salary Motion"). Following a hearing held on November 13, 2025, the Court entered an *Interim Order Granting Debtors' Emergency Motion for Allowance of Affiliate Officer's Salary and Benefits, Effective as of the Petition Date* [ECF No. 48], which (a) granted the Affiliate Officer Salary Motion on an interim basis, pending a final hearing scheduled for December 17, 2025, (b) authorized the Debtor, TP Brands International Inc. to pay Winter (1) his postpetition gross weekly compensation of $6,250.00, plus (2) his health insurance premiums under the company plan, (3) his life insurance premiums on two life insurance policies on the life of Winter, and (4) his business expenses in the ordinary course; and authorized the Debtor, TP Brands International Inc. to pay to Winter, the sum of $6,250.00 for his prepetition wages for the prepetition period of November 3, 2025 through November 7, 2025.

On December 12, 2025, as set forth above, PNC filed the PNC Objection, objecting to the use of cash collateral and, the continued payment of Winter's postpetition salary and benefits.

On December 30, 2025, the Court entered a *Second Interim Order Granting Debtors' Emergency Motion for Allowance of Affiliate Officer's Salary and Benefits* [ECF No. 75], which granted the Affiliate Officer Salary Motion, on a second interim basis, pending a final hearing scheduled for February 2, 2026, and authorized the Debtor, TP Brands International Inc. to pay Winter (1) a reduced gross weekly compensation of $4,807.69 ($250,000 annually), plus (2) his health insurance premiums under the company plan, (3) his life insurance premiums on two life insurance policies on the life of Winter, and (4) his business expenses in the ordinary course.

On February 6, 2026, the Court entered a *Third Interim Order Granting Debtors' Emergency Motion for Allowance of Affiliate Officer's Salary and Benefits* [ECF No. 90], which approved the Affiliate Officer Salary Motion on a third interim basis, pending a final hearing on March 25, 2026.

**The Settlement with PNC**

On January 7, 2026, the Debtors and PNC, along with their respective counsel, participated in a mediation with respect to the Cash Collateral Motion, the Affiliate Officer Salary Motion, and all other disputes between the Debtors and PNC. At the mediation, the Debtors and PNC were able to resolve their disputes and have entered into the Settlement Term Sheet. The terms of the Settlement Term Sheet are incorporated into the Plan.

The proposed treatment of PNC's Class 3 claim is included as part of the settlement between PNC and the Debtors, as set forth in the Settlement Term Sheet, and PNC has agreed to support the Debtors' Plan, provided it is consistent with the Settlement Term Sheet.

35584519-11

## SUMMARY OF PLAN OF REORGANIZATION

### Introduction

Chapter 11 is the principal reorganization chapter of the Bankruptcy Code. Under Chapter 11, a debtor is authorized to reorganize and/or liquidate for its own benefit and the benefit of its creditors. The formulation of a plan is the principal objective of a Chapter 11 case. In general, a Chapter 11 plan (i) divides claims and interests into separate classes, (ii) specifies the property that each class is to receive under such plan, and (iii) contains other provisions necessary to the reorganization and/or liquidation of the debtor. Chapter 11 does not require each Holder of a claim or interest to vote in favor of the plan for the Bankruptcy Court to confirm the plan. However, a plan must be accepted by the holders of at least one impaired class of claims (unless there are no impaired classes) without considering the votes of "insiders" within the meaning of the Bankruptcy Code.

The summary of the Plan contained herein addresses only certain provisions of the Plan. As a summary, it is qualified in its entirety by reference to the Plan itself. Upon Confirmation and the Effective Date, the Plan shall bind the Debtors, all the Debtors' Creditors, and other parties in interest except as expressly set forth in the Plan. TO THE EXTENT THAT THE TERMS OF THIS DISCLOSURE STATEMENT VARY OR CONFLICT WITH THE TERMS OF THE PLAN, THE TERMS OF THE PLAN SHALL CONTROL.

### Treatment of Unclassified Claims

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims, Professional Fee Claims, and Priority Tax Claims have not been classified against the Debtors.

### A. Administrative Expense Claims

Requests for payment of Administrative Expense Claims (except for Professional Fee Claims) must be Filed and served no later than the applicable Administrative Expense Claims Bar Date pursuant to the procedures specified in the Confirmation Order. Holders of Administrative Expense Claims that are required to File and serve a request for payment of such Claims that fail to do so shall be forever barred, estopped, and enjoined from asserting such Administrative Expense Claims against the Debtors, the Reorganized Debtors, as applicable, or their respective property, and such Administrative Expense Claims shall be deemed discharged as of the Plan Effective Date without the need for any objection or any notice to any Person or an order of the Bankruptcy Court.

Except to the extent that a holder of an Allowed Administrative Expense Claim agrees to a less favorable treatment, to the extent an Allowed Administrative Expense Claim has not been paid in full or otherwise satisfied during the Chapter 11 Cases, each holder of an Allowed Administrative Expense Claim (other than Professional Fee Claims) shall receive from the Debtors, in full and final satisfaction of its Allowed Administrative Expense Claim, payment in full in Cash in accordance with the following: (1) if such Administrative Expense Claim is Allowed

35584519-11

on or prior to the Plan Effective Date, on the Plan Effective Date; (2) if such Administrative Expense Claim is not Allowed as of the Plan Effective Date, no later than thirty (30) days after the date on which such Administrative Expense Claim is Allowed; (3) if such Allowed Administrative Expense Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date, in accordance with the terms and conditions of the particular transaction or course of business giving rise to such Allowed Administrative Expense Claim; or (4) at such time and upon such terms as set forth in a Final Order of the Bankruptcy Court.

**B.    Professional Fee Claims**

1.    <u>Payment of Professional Fee Claims</u>

The Bankruptcy Court shall determine the Allowed amounts of all Professional Fee Claims in accordance with the procedures established by the Bankruptcy Code, Bankruptcy Rules, Local Rules, and prior Bankruptcy Court orders.

2.    <u>Post-Confirmation/Pre-Effective Date</u>

From and after the Confirmation Date until the Effective Date, the Debtors, without the necessity for any approval by the Bankruptcy Court, shall pay the reasonable fees and necessary and documented expenses of the Professionals during such period.

3.    <u>Post-Effective Date Fees and Expenses</u>

Upon the Plan Effective Date, any requirement that the Reorganized Debtors' Professionals comply with sections 327 through 331, 363, and 1103 of the Bankruptcy Code in seeking retention for services rendered after such date shall terminate, and the Reorganized Debtors may employ any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

**C.    Priority Tax Claims**

Except to the extent that a holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of, and in exchange for, the Allowed Priority Tax Claims, each holder of an Allowed Priority Tax Claim shall receive treatment consistent with section 1129(a)(9) of the Bankruptcy Code by the applicable Debtor against which such Allowed Priority Tax Claims are validly asserted.

**Classification of Claims and Interests**

***In General.*** Claims and Equity Interests will be treated under the Plan in the manner set forth in Article III. Except as otherwise specifically provided in the Plan, the treatment of, and the consideration to be received by, Holders of Allowed Claims and Holders of Allowed Equity Interests pursuant to the Plan will be in full and final satisfaction, settlement, release, extinguishment, and discharge of their respective Allowed Claims, of any nature whatsoever and Allowed Equity Interests.

35584519-11

*Class 1: Priority Claims.* Class 1 is comprised of all Allowed Priority Claims against the Debtors. Each holder of an Allowed Class 1 Claim shall receive from the Debtors, in the sole discretion of the Debtors in full satisfaction, settlement, release, and extinguishment of such Claim: (a) Cash equal to the amount of such Allowed Priority Claim as soon as practicable after the latest of (i) the Effective Date, (ii) the date that Priority Claim becomes Allowed, and (iii) a date agreed to by the Debtors and the holder of such Class 1 Claim; (b) such other treatment such that it will not be impaired pursuant to section 1124 of the Bankruptcy Code; or (c) such other less favorable treatment on such other terms and conditions as may be agreed upon in writing by the holder of such Priority Claim and the Debtors. Class 1 is Unimpaired and, therefore, is not entitled to vote to accept or reject the Plan. Class 1 is presumed to have accepted the Plan.

*Class 2: Secured Tax Claims of Governmental Units.* Class 2 is comprised of all Allowed Secured Tax Claims of Governmental Units. As soon as practicable after the Effective Date, the Debtors shall pay each holder of an Allowed Secured Tax Claim an amount, in Cash, equal to the Allowed Amount of its Secured Tax Claim in accordance with 11 U.S.C. § 1129(a). Class 2 is Unimpaired and, therefore, is not entitled to vote to accept or reject the Plan. Class 2 is presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.

*Class 3: Secured Claim of PNC.* Class 3 is comprised of the allowed secured claim of PNC Bank, National Association in the amount of $3,301,458.04 (comprised of $3,005,056.87 in principal, $277,466.91 in accrued pre-petition interest, and $18,934.26 in unreimbursed pre-petition attorneys' fees and cots), secured by a blanket lien on all assets of the Debtors (the "PNC Allowed Secured Claim"). The PNC Allowed Secured Claim shall be allowed in the amount of $3,301,458.04. The principal amount of the PNC Allowed Secured Claim ($3,005,056.87) shall accrue interest at the rate of prime plus two percent, variable monthly, with a cap of 8.75% per annum. Beginning on the first day of the third full calendar month following the Effective Date and for fifty-nine months thereafter, the Debtors shall make monthly payments to PNC in the amount of $30,000.00 on account of the PNC Allowed Secured Claim which shall be applied first to currently accrued monthly interest then to principal. Thereafter, in the 60th month, the Debtors shall make a balloon payment of all remaining principal, interest and fees due on the PNC Allowed Secured Claim. In addition, the Debtors shall pay PNC all of the net proceeds of sales of inventory within two (2) business days of receipt of such sale proceeds by wire transfer or ACH payment which sums shall be applied to the principal due under the PNC Allowed Secured Claim. The net proceeds to PNC from the sale of inventory shall be not less than $400,000, unless PNC and the Debtors agree in writing otherwise. On or before thirty (30) days after the end of each year following the Effective Date, the Debtors shall pay to PNC fifty percent (50%) of the Debtors' Net Profit (after the annual payment to Holders of Allowed Unsecured Claims as set forth in the Plan) to be applied to the principal due under the PNC Allowed Secured Claim. The Debtors shall maintain a single operating bank account at PNC (the "PNC Operating Account"), into which all the Debtors' revenues shall be deposited and from which all business expenses shall be paid (which shall be specifically ordered in the Confirmation Order). HW, the licensee under the License Agreement, shall be required by the Confirmation Order to deposit by ACH all amounts due under the License Agreement into the PNC Operating Account. PNC shall be entitled to reasonable reporting on a quarterly and annual basis. There shall be no penalty for the prepayment of any portion of the PNC Allowed Secured Claim. The salaries of Ed Loiselle, Tom Winter, and Ashley Winter in the current annual amounts of $125,000.00, $250,000.00, and $40,000.00, respectively,

12

shall be limited to a five percent (5%) annual increase beginning one year from the Effective Date until payment in full of the PNC Allowed Secured Claim. Such salaries shall not be paid if there is a default in payments to PNC. PNC's lien on all assets of the Debtors shall remain unimpaired and continue to secure the PNC Allowed Secured Claim. The Debtors shall have ten days from written notice of default to cure such default. Default notices shall be sent via email to: (1) the Debtors care of Winter at tom.winter@tpbrandsintl.com; (2) Winter at tom.winter@tpbrandsintl.com; (3) the Debtors' counsel Edward J. Peterson III at epeterson@bergersingerman.com; and (4) Winter's counsel Matt B. Hale at mhale@srbp.com. If a payment default is not cured within 10 days of a default notice, then PNC may seek the entry of an expedited judgment against the Debtors and Winter as set forth in Article X of the Plan below. Class 3 is Impaired under the Plan and the holders of Allowed Class 3 Claims are entitled to vote to accept or reject the Plan.

*Class 4: BMW Financial Services NA, LLC Claim.* Class 4 is comprised of the claim of BMW Financial Services NA, LLC in the amount of $38,456.66 secured by a lien on a 2025 BMW X7 M60i. BMW Financial Services NA, LLC's claim shall be allowed as filed and paid in accordance with the prepetition loan documents. There are no prepetition arrearages owed to BMW Financial Services NA, LLC. Class 4 is Unimpaired under the Plan and the holder of the Allowed Class 4 Claim is presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.

*Class 5: Other Secured Claims.* Class 5 is comprised of the Allowed Other Secured Claims. Except to the extent that a holder of an Allowed Other Secured Claim against any of the Debtors has agreed to less favorable treatment of such Claim, each such holder of an Allowed Other Secured Claim shall receive, at the option of the Debtors, in full and final satisfaction of such Allowed Other Secured Claim, (i) payment in full in Cash, payable on the later of the Effective Date and the first Business Day after thirty (30) calendar days from the date on which such Other Secured Claim becomes an Allowed Other Secured Claim, or as soon as reasonably practical thereafter, (ii) delivery of the collateral securing such Allowed Other Secured Claim, or (iii) such other treatment necessary to satisfy section 1129 of the Bankruptcy Code. Class 5 is Unimpaired, and the holders of Other Secured Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, the holders of Other Secured Claims are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to the Other Secured Claims.

*Class 6: General Unsecured Claims.* Class 6 is comprised of all General Unsecured Claims against the Debtors not otherwise classified under the Plan. Each holder of an Allowed Unsecured Claim in Class 5 shall receive their pro rata share of the Unsecured Annual Payments. The first of the Unsecured Annual Payments shall be made on or before thirty (30) days after the end of each year following the Effective Date. Class 6 is Impaired under the Plan the holders of Allowed Unsecured Claims in Class 6 are entitled to vote to accept or reject the Plan.

*Class 7: Equity Interests*. Class 7 is comprised of all Equity Interests. The holders of Equity Interests shall retain their Interests in the Reorganized Debtors. Class 7 is Unimpaired under the Plan and the holders of Equity Interests are presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.

35584519-11

## RETENTION OF JURISDICTION

*General Retention.* Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, until the Chapter 11 Cases are closed, the Bankruptcy Court shall retain the fullest and most extensive jurisdiction of the Chapter 11 Cases that is permitted by applicable law, including that necessary to ensure that the purposes and intent of the Plan are carried out.

*Enduring Jurisdiction of the Chapter 11 Cases.* In addition to the retention of jurisdiction set forth above, the Bankruptcy Court shall retain jurisdiction of the Chapter 11 Cases to enter an order reopening the Chapter 11 Cases after they have been closed.

## CERTAIN FEDERAL INCOME TAX CONSEQUENCES

*General*

The tax consequences of the Plan to the Debtors and to Holders of Claims and Equity Interests are discussed below. This discussion of the federal income tax consequences of the Plan to the Debtors and Holders under U.S. federal income tax law, including the Internal Revenue Code of 1986, as amended (the "Tax Code"), is provided for informational purposes only. While this discussion addresses certain of the material tax consequences of the Plan, it is not a complete discussion of all such consequences and is subject to substantial uncertainties. Moreover, the consequences to a Holder may be affected by matters not discussed below (including, without limitation, special rules applicable to certain types of persons, such as persons holding non-vested stock or otherwise subject to special rules, nonresident aliens, life insurance companies, and tax-exempt organizations) and by such Holders' particular tax situations. In addition, this discussion does not address any state, local, or foreign tax considerations that may be applicable to particular Holders.

**HOLDERS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS REGARDING THE TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING STATE, LOCAL AND FOREIGN TAX CONSEQUENCES. THE DEBTORS' GENERAL BANKRUPTCY COUNSEL HAS NO TAX EXPERTISE AND HAS NOT RESEARCHED OR ANALYZED TAX CONSEQUENCES RESULTING FROM THE PLAN.**

**SOME OF THE ISSUES DISCUSSED BELOW ARE COMPLEX, AND THERE CAN BE NO ASSURANCE OF THE ACCURACY OF THIS INFORMATION.**

*General Federal Income Tax Consequences to Holders*

*In General.* The following discussion addresses certain of the material consequences of the Plan to Holders. Under the Plan, the tax consequences of the Plan to a Holder will depend, in part, on the type of consideration received in exchange for the Claim or Equity Interest and the tax status of the Holder, such as whether the Holder is an individual, corporation or other entity, whether the Holder is a resident of the United States, the accounting method of the Holder, and

14

35584519-11

the tax classification of the Holder's particular Claim or Equity Interest. **HOLDERS ARE STRONGLY ADVISED TO CONSULT THEIR OWN TAX ADVISORS WITH RESPECT TO THE TAX TREATMENT UNDER THE PLAN OF THEIR PARTICULAR CLAIM OR EQUITY INTEREST**.

*Tax Consequences to Holders of Claims and Equity Interests*. The Holders of Claims against and Equity Interests in the Debtors are urged to consult with their tax advisors as to the consequences of the Plan to them. Among the issues the Holders of Claims and/or Equity Interests and their advisors may wish to consider are:

(1)     The extent to which the Holder of a Claim and/or Equity Interest is entitled to a bad debt deduction or a worthless securities loss.

(2)     The extent to which the Holder of a Claim or Equity Interest recognizes gain or loss on the exchange of its Claim or Equity Interest for property, debt, and stock of the Debtors and the character of that gain or loss.

(3)     The basis and the holding period for any property, debt, and stock received by the Holder of a Claim or Equity Interest.

(4)     Whether the original issue discount rules, market discount rule, and amortizable bond premium rules apply to any debt received by the Holder of a Claim or Equity Interest.

(5)     The treatment of property, stock, or debt, if any, received by the Holder of a Claim or Equity Interest in satisfaction of accrued interest.

(6)     The effect of a Holder of a Claim or Equity Interest receiving a deferred distribution or distribution that is contingent in amount.

**Certain Federal Income Tax Consequences to the Debtors**

*Cancellation of Indebtedness Income*. Generally, cancellation of indebtedness triggers ordinary income to a debtor equal to the adjusted issue price (as determined for federal income tax purposes) of the indebtedness cancelled. If debt is discharged in a Chapter 11 case, however, a debtor does not recognize cancellation of indebtedness income. Instead, certain tax attributes otherwise available to the debtor are reduced by the amount of the indebtedness cancelled. Tax attributes subject to reduction include: (i) net operating losses (NOL) and NOL carryforwards; (ii) most credit carryforwards; (iii) capital losses and carryforwards; (iv) the tax basis of the debtor's depreciable and non-depreciable assets; (v) passive activity loss and credit carryovers; and (vi) foreign tax credit carryforwards.

Under Sections 108(b) and 1017 of the Tax Code, attributes are reduced in the following order: first, net operating loss carryover; second, general business credit carryovers; third, capital loss carryovers; and fourth, tax basis. In lieu of reducing net operating loss and carryovers, the taxpayer can elect to reduce tax basis first. Such an election shall not apply to an amount greater

15

than the aggregate adjusted bases of depreciable property held by the taxpayer as of the beginning of the taxable year following the taxable year in which the discharge occurs.

Therefore, any cancellation of indebtedness income realized by the Debtors would require a reduction in their NOLs or other tax attributes. Because attribute reduction is calculated only after the tax for the year of discharge has been determined, however, the realization of substantial amounts of cancellation of indebtedness income as a result of implementation of the Plan should not diminish the NOLs and NOL carry forwards otherwise available to offset other income recognized in the year in which the Plan is consummated.

Additionally, any sale of the Debtors' assets pursuant to the Plan may result in taxable income to the Debtors if the tax basis in the assets sold is less than the sales price.

The Debtors do not believe that a principal purpose of the Plan is the avoidance of federal income tax within the meaning of Section 269 of the Internal Revenue Code.

### *Importance of Obtaining Professional Tax Assistance*

This discussion is intended only as a summary of certain federal income tax consequences of the Plan and is not a substitute for careful tax planning with a tax professional. The tax consequences are in many cases uncertain and may vary depending on a Holder's individual circumstances. Accordingly, Holders are urged to consult with their tax advisors about the federal, state, local and foreign tax consequences of the Plan.

## VOTING ON AND CONFIRMATION OF THE PLAN

### *Confirmation and Acceptance by All Impaired Classes*

At the Confirmation Hearing, the Bankruptcy Court will confirm the Plan if all the requirements of Bankruptcy Code Section 1129 are met. Among the requirements for confirmation of a plan are that the Plan be accepted by all impaired classes of claims and equity interests, and satisfaction of the matters described below.

*Feasibility.* A plan may be confirmed only if it is not likely to be followed by the liquidation or the need for further financial reorganization of a debtor. The Plan provides for the reorganization of the Debtors' business and the payment of Allowed Claims, including contingent, unliquidated, and Disputed Claims to the extent they become Allowed Claims, in the order of their priority. The projections attached as **Exhibit C** demonstrate that the Plan is feasible.

TP Brands International Inc. operates under the License Agreement with HW pursuant to which HW has an exclusive license to use certain intellectual property of the Debtors for the marketing and sale of certain products. The Debtors entered into this agreement to ensure a revenue stream to fund a reorganization. Under the License Agreement, TP Brands International is incentivized to grow its business and HW pays royalties and fees based on sales growth. The License Agreement allowed the Debtors to shift their business from a capital-intensive

16

35584519-11

warehousing and distribution model to a licensing and sales model.  Under the License Agreement, TP Brands International repositioned itself into being a manufacturer's representative focusing on sales and growing the business and HW handles the purchasing and housing of inventory.  This allowed the Debtors to preserve its relationships with its largest customers which are now being serviced by HW.  TP Brands International employs salespeople to sell product which is then purchased by HW.

As shown in the Projections, the Debtors anticipate that cash flow under the License Agreement will steadily increase over time and will be sufficient to fund the distributions anticipated by the Plan.

***Best Interests Standard****.* The Bankruptcy Code requires that the Plan meet the "best interest" test, which requires that members of a Class must receive or retain under the Plan, property having a value not less than the amount which the Class members would have received or retained if the Debtors were liquidated under Chapter 7 on the same date. In a Chapter 7 case, a trustee would be appointed to liquidate the Assets of the Debtors. Converting the cases to Chapter 7 prior to a sale would have caused the value of the Assets to diminish substantially and would have added an additional layer of administrative expenses to the Estate, further depleting any funds available for distribution to Unsecured Creditors.

The Debtors believe that liquidation under Chapter 7 at this juncture would result in diminution of the value of the interests of the Creditors because of (a) additional administrative expenses involved in the appointment of a trustee and attorneys, accountants, and other professionals to assist such trustee; (b) additional claims, some of which might be entitled to priority, which might be filed following the conversion of the case; (c) the inability to utilize the work-product and knowledge of the Debtors and their Professionals; (d) the substantial delay which would elapse before Creditors would receive any distribution in respect of their Claims; and (e) the loss to Unsecured Creditors.

The Debtors believe that the Plan will provide better recoveries to creditors than in a chapter 7 liquidation, as shown in the Liquidation Analysis attached as **Exhibit B**.  As set forth in the Plan, the Debtors propose to provide holders of Allowed Unsecured Creditors with the Unsecured Annual Payments, which consist of the pro rata share of annual payments totaling $200,000.00 in the aggregate over the five years following the Effective Date of the Plan, which equates to an estimated distribution of approximately 1.89%.[2]  In a liquidation, the recoveries for unsecured creditors would likely be nothing.

As set forth in the Liquidation Analysis, the Debtors project that their recoveries on their accounts receivable balance will be between 3.78% ($65,007.90), on the low end, to 18.90% ($325,039.52), on the high end. The Debtors anticipate this level of recovery because the accounts receivable balances are mostly over 90 days past due and are largely attributable to a dynamic involving the Debtors' Asia-based vendors, primarily located in China and Vietnam.

---

[2] This is based upon assumed allowed general unsecured claims totaling $10,550,631.01. This number does not include intercompany claims by a Debtor against another Debtor.

35584519-11

In the ordinary course of business, when the Debtors received defective or non-conforming products from their Asia-based vendors, those vendors did not issue traditional credit memos that would have reduced the Debtors' accounts payable balances. Instead, the vendors issued credit claims and agreed to replace the defective or non-conforming materials at no additional cost to the Debtors.   While this arrangement addressed the quality issue, it did not reduce the Debtors' outstanding accounts payable to those vendors. At the same time, the Debtors' customers — who had received the defective products — understandably refused to pay for them until they received conforming replacements. As a result, the Debtors' accounts receivable balances continued to grow, while their accounts payable balances remained unchanged, creating a significant imbalance between the two.  The Debtors would have preferred that their Asia-based vendors simply reduce the accounts payable balances owed to them, which would have brought the Debtors' books into better alignment. However, the vendors refused to do so, insisting instead on providing replacement products.  This arrangement became untenable in early 2025 when substantial tariffs were imposed on goods imported from China and Vietnam.  Although the Asia-based vendors were still willing to ship replacement products, they required the Debtors to cover the associated freight, tariffs, and duties — costs the Debtors were unable to absorb.  By April 2025, the vendors stopped shipping replacement products altogether due to the tariff environment.  Without the ability to deliver conforming replacement products to their customers, the Debtors lost the ability to collect the outstanding receivables from those customers. As a consequence, a significant portion of the accounts receivable recorded on the Debtors' books became uncollectible, which is reflected in the projected recovery range set forth in the Liquidation Analysis.

The Liquidation Analysis attached as **Exhibit B** demonstrates that the Plan satisfies the best interests test.

**Confirmation Without Acceptance by All Impaired Classes.** If one or more of the Impaired Classes of Claims or Equity Interests does not accept the Plan, the Plan may nevertheless be confirmed and be binding upon the non-accepting Impaired Class under the "cram-down" provisions of the Bankruptcy Code if the Plan does not "discriminate unfairly" and is "fair and equitable" to the non-accepting Impaired Classes under the Plan.

***Discriminate Unfairly***. The Bankruptcy Code requirement that a plan not "discriminate unfairly" means that a dissenting class must be treated equally with respect to other classes of equal rank. The Debtors believe that the Plan does not "discriminate unfairly" with respect to any Class of Claims or Equity Interests because no class is afforded treatment which is disproportionate to the treatment afforded to other Classes of equal rank.

***Fair and Equitable Standard***. The "fair and equitable" standard, also known as the "absolute priority rule," requires that a dissenting class receive full compensation for its allowed claims or interests before any junior class receives any distribution. The Debtors believe the Plan is fair and equitable to all Classes pursuant to this standard.

With respect to Impaired Classes of Unsecured Claims that vote against the Plan, Bankruptcy Code Section 1129(b)(2)(B) provides that a plan is "fair and equitable" if it provides that (i) each Holder of a claim of such a class receives or retains on account of such claim, property of a value as of the effective date of the plan equal to the allowed amount of such claim; or (ii) the

35584519-11

Holder of any claim or interest that is junior to the claims of such class will not receive or retain any property under the plan on account of such junior claim or interest. The Debtors believe that the Plan meets these standards.

The Debtors intend to evaluate the results of any balloting and determine whether to seek Confirmation of the Plan in the event that less than all the Impaired Classes of Claims vote to accept the Plan. The determination as to whether to seek Confirmation under such circumstances will be announced before or at the Confirmation Hearing.

*Non-Confirmation of the Plan.* If the Plan is not confirmed by the Bankruptcy Court, the Court may permit the filing of an amended plan, dismiss the cases, or convert the cases to Chapter 7. In a Chapter 7 case, the Debtors' assets would be sold and distributed to the Unsecured Creditors after the payment of all Secured Claims, costs of administration, and the payment of priority claims.  In the event of a Chapter 7 case, the Debtors believe there will be little to no recovery for Unsecured Creditors.

The cost of distributing the Plan and this Disclosure Statement, as well as the costs, if any, of soliciting acceptances, will be borne by the Estates.

## ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

If the Plan is not confirmed, the potential alternatives include (a) alternative plans under Chapter 11 (including another liquidation plan), (b) dismissal of the cases, or (c) conversion of the cases to cases under Chapter 7 of the Bankruptcy Code.

### *Alternative Plans of Reorganization*

If the Plan is not confirmed, the Debtors could attempt to formulate and propose a different plan or plans. The Debtors believe that the Plan will enable Creditors to be paid the maximum amount possible for their Allowed Claims.

### *Liquidation under Chapter 7 or Chapter 11*

If a plan is not confirmed, the Chapter 11 Cases may be converted to a Chapter 7 liquidation cases. Converting the cases to Chapter 7 would add an additional layer of administrative expenses to the Estate that would deplete funds available for distribution to Unsecured Creditors. The Debtors believes that conversion to Chapter 7 is inferior because of: (a) additional administrative expenses associated with the appointment of a Chapter 7 trustee and attorneys, accountants, and other professionals to assist such trustee; (b) additional claims, some of which might be entitled to priority, which might be filed following the conversion of the case; and (c) additional delays which would elapse before Creditors would receive any distribution in respect of their Claims. Accordingly, the Debtors believes that the Plan is superior to liquidation under Chapter 7.  In the event of a Chapter 7 conversion, the Debtors believe there will be little to no recovery for Unsecured Creditors.

35584519-11

**SUMMARY, RECOMMENDATION AND CONCLUSION**

The Plan provides for distributions to be made to the Holders of Allowed Claims against the Debtors in accordance with the priorities set forth in the Bankruptcy Code. The Debtors believe that conversion of the case to Chapter 7 would add a layer of administrative expenses and reduce distributions to the Holders of Allowed Claims. For the reasons set forth above, the Debtors believe that the distributions under this Plan are greater than they would be in a Chapter 7. Accordingly, the Debtors submit that the Plan is in the best interests of all Creditors and should be Plan be accepted.

Dated: March 13, 2026.                    Respectfully submitted,

TP Brands Worldwide Inc.
TP Brands International Inc.
Premfloor, Inc.

By:  /s/ *Thomas J. Winter*
         Thomas J. Winter, President

BERGER SINGERMAN LLP
*Counsel for the Debtors and Debtors-in-Possession*
101 E. Kennedy Boulevard, Suite 1165
Tampa, FL 33602
Tel. (813) 498-3400
Fax (813) 527-3705

By:  */s/ Edward J. Peterson*
         Edward J. Peterson
         Florida Bar No. 0014612
         epeterson@bergersingerman.com
         Clay B. Roberts
         Florida Bar No. 116058
         croberts@bergersingerman.com

*Filer's Attestation: Pursuant to Local Rule 1001-2(g)(3) regarding signatures, Edward J. Peterson attests that concurrence in the filing of this paper has been obtained.*

35584519-11

EXHIBIT A
Post-Petition Finanical Performance

**TP Brands International, Inc. and Subsidiaries**

| | 11/14/2025 | 11/21/2025 | 11/28/2025 | 12/5/2025 | 12/12/2025 | 12/19/2025 | 12/26/2025 | 1/2/2026 | 1/9/2026 | 1/16/2026 | 1/23/2026 | 1/30/2026 | 2/6/2026 | 2/13/2026 | 2/20/2026 | 2/27/2026 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Beginning Bank Balance | $62,435.00 | $44,821.90 | $42,307.23 | $40,873.38 | $35,913.18 | $101,295.94 | $99,944.27 | $85,559.93 | $81,904.39 | $96,988.09 | $92,849.33 | $89,826.93 | $68,037.32 | $68,010.73 | $70,345.54 | $109,425.43 |
| **Bank Deposits (Cash Receipts)** | 2,424.00 | 17,370.30 | 18,135.66 | 15,200.00 | 85,094.58 | 13,032.67 | - | 10,800.00 | 32,600.00 | 13,500.00 | 11,465.62 | 12,380.20 | 12,900.00 | 14,850.00 | 53,661.51 | 18,817.97 |
| COG Material | | | | | | | | | | | | | | | | |
| Payroll | $ 11,790.61 | $ 11,790.61 | $ 11,790.61 | $ 11,790.61 | $ 11,790.61 | $8,615.37 | $8,615.37 | $8,615.37 | $8,615.37 | $8,615.37 | $8,615.37 | $7,911.63 | $7,031.14 | $6,586.14 | $8,615.37 | $ 8,615.37 |
| Payroll Taxes | $ 1,112.36 | $ 1,112.36 | $ 1,112.36 | $ 1,112.36 | $ 1,112.36 | $539.54 | $539.54 | $539.54 | $539.54 | $539.54 | $539.54 | $539.54 | $502.34 | $502.34 | $539.54 | $ 496.95 |
| Affiliate Officer Compensation | $ 6,250.00 | $ 6,250.00 | $ 6,250.00 | $ 6,250.00 | $ 6,250.00 | $4,807.69 | $4,807.69 | $4,807.69 | $4,807.69 | $4,807.69 | $4,807.69 | $4,807.69 | $4,807.69 | $4,807.69 | $4,807.69 | $ 4,807.69 |
| Affiliate Officer Compensation - Payroll Taxes | $340.63 | $340.63 | $275.25 | $275.25 | $275.25 | $275.25 | $275.25 | $275.25 | $275.25 | $275.25 | $275.25 | $275.25 | $275.25 | $275.25 | $275.25 | $275.25 |
| Payroll Processing and Work Comp. | $ 250.00 | $ 141.29 | $ 141.29 | 141.29 | $ 250.00 | 146.49 | 146.49 | 146.49 | 146.49 | 146.49 | 146.49 | 146.49 | 146.49 | 146.49 | 146.49 | $ 13.49 |
| China Office Expenses | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 10,000.00 |
| Utilities/Internet | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Office Overhead | - | 250.08 | | 322.69 | - | - | | 71.20 | 3,131.96 | 1,270.00 | 103.68 | 263.25 | 163.68 | 163.68 | 163.68 | |
| Freight (inbound/outbound) | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Computer Software/Technology Stack | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| NetSuite | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Legal fees | $ - | - | - | - | $ - | - | - | - | $ - | - | - | - | - | $ - | - | - |
| Accounting Fees | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Insurance (Auto, Liability, Property, etc) | 293.50 | | - | 268.00 | 33.60 | | - | - | - | 1,984.42 | - | - | - | 33.60 | 33.60 | - |
| Business Expenses | - | - | - | - | - | - | - | - | - | - | - | | - | - | - | - |
| Bank Fees | - | 15.00 | - | - | - | 15.00 | - | - | - | - | - | - | - | - | - | 50.00 |
| Expenses for Tom Winter (to be reimbursed) | 11,467.55 | | | - | - | | | - | - | | | 20,225.96 | - | - | | 20,225.96 |
| Adequate Protection Payment to PNC | - | - | - | | - | - | - | | - | - | - | 20,225.96 | | - | - | 20,225.96 |
| Life Insurance for PNC Loan | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total Expenses** | $20,037.10 | $19,884.97 | $19,569.51 | $20,160.20 | $19,711.82 | $14,384.34 | $14,384.34 | $14,455.54 | $17,516.30 | $17,638.76 | $14,488.02 | $34,169.81 | $12,926.59 | $12,515.19 | $14,581.62 | $44,484.71 |
| Net Operating Income | -$17,613.10 | -$2,514.67 | -$1,433.85 | -$4,960.20 | $65,382.76 | -$1,351.67 | -$14,384.34 | -$3,655.54 | $15,083.70 | -$4,138.76 | -$3,022.40 | -$21,789.61 | -$26.59 | $2,334.81 | $39,079.89 | -$25,666.74 |
| **Ending Balance** | $44,821.90 | $42,307.23 | $40,873.38 | $35,913.18 | $101,295.94 | $99,944.27 | $85,559.93 | $81,904.39 | $96,988.09 | $92,849.33 | $89,826.93 | $68,037.32 | $68,010.73 | $70,345.54 | $109,425.43 | $83,758.69 |

EXHIBIT B
Liquidation Analysis

### Chapter 7 Liquidation Analysis for All Entities Combined

| | | | | Potential Recovery | | | | |
|---|---|---|---|---|---|---|---|---|
| | | Est.December 31, 2025 | Recovery Estimate % | | | Recovery Estimate $ | | |
| Gross Liquidation Proceeds: | Note: | Net Book Value | Low | Medium | High | Low | Medium | High |
| Ending Cash | | $69,336.00 | 100.00% | 100.00% | 100.00% | $69,336.00 | $69,336.00 | $69,336.00 |
| A/R Balance | | $1,720,031.88 | 3.78% | 7.56% | 18.90% | $65,007.90 | $130,015.81 | $325,039.52 |
| Vendor Deposits | | $131,778.88 | 0.00% | 0.00% | 0.00% | $0.00 | $0.00 | $0.00 |
| Security Deposit | | $26,945.01 | 0.00% | 0.00% | 0.00% | $0.00 | $0.00 | $0.00 |
| Trademarks | | $0.00 | 0.00% | 0.00% | 0.00% | $0.00 | $0.00 | $0.00 |
| Internet Domain Names and Websites | | $0.00 | 0.00% | 0.00% | 0.00% | $0.00 | $0.00 | $0.00 |
| Customer List | | $0.00 | 0.00% | 0.00% | 0.00% | $0.00 | $0.00 | $0.00 |
| Due from Premfloor, Inc. | | $2,757,068.00 | 0.00% | 0.00% | 0.00% | $0.00 | $0.00 | $0.00 |
| Due from TP Worldwide Inc. | | $1,780,331.00 | 0.00% | 0.00% | 0.00% | $0.00 | $0.00 | $0.00 |
| U.S. Customs Receivable | | $429,851.00 | 0.00% | 0.00% | 0.00% | $0.00 | $0.00 | $0.00 |
| Inventory | | $731,004.40 | 25.00% | 35.00% | 60.00% | $182,751.10 | $255,851.54 | $438,602.64 |
| **Total Assets** | | **$7,646,346.17** | | | | **$317,095.00** | **$455,203.35** | **$832,978.16** |
| **Less Liquidation Adjustments** | | | | | | | | |
| Administrative Professional Fees | | | | | | -$100,000.00 | -$100,000.00 | -$100,000.00 |
| Chapter 7 Trustee (3% statutory minimum) | | | | | | -$9,513.00 | -$13,656.00 | -$24,989.00 |
| Chapter 7 Estate Winddown | | | | | | -$20,000.00 | -$20,000.00 | -$20,000.00 |
| **Total Liquidation Adjustments** | | | | | | -$129,513.00 | -$133,656.00 | -$144,989.00 |
| **Net Liquidation Proceeds Available for Distribution to Creditors** | | | | | | **$187,582.00** | **$321,547.35** | **$687,989.16** |

| | | | | Estimated Recovery by Class | | | | |
|---|---|---|---|---|---|---|---|---|
| | | Est. December 31, 2025 | Recovery Estimate % | | | Recovery Estimate $ | | |
| Class: | Note: | Net Book Value | Low | Medium | High | Low | Medium | High |
| Class 1 - Priority Claims | | $0.00 | 0.00% | 0.00% | 0.00% | $0.00 | $0.00 | $0.00 |
| Class 2 - Secured Tax Claims of Governmental Units | | $995.66 | 100.00% | 100.00% | 100.00% | $995.66 | $995.66 | $995.66 |
| Class 3 - Secured Claim of PNC | | $3,462,518.65 | 5.39% | 9.26% | 19.84% | $186,586.34 | $320,551.69 | $686,993.50 |
| Class 4 - BMW Financial Services, NA, LLC | | $38,456.66 | 0.00% | 0.00% | 0.00% | $0.00 | $0.00 | $0.00 |
| Class 5 - Other Secured Claims | | $120,947.89 | 0.00% | 0.00% | 0.00% | $0.00 | $0.00 | $0.00 |
| Class 6 - General Unsecured Claims | | $15,067,870.19 | 0.00% | 0.00% | 0.00% | $0.00 | $0.00 | $0.00 |
| Class 7 - Equity | | $0.00 | 0.00% | 0.00% | 0.00% | $0.00 | $0.00 | $0.00 |
| **Total Estimated Recovery** | | **$18,690,789.05** | | | | **$187,582.00** | **$321,547.35** | **$687,989.16** |

EXHIBIT C
Post-Confirmation Projections

**TP Brands International and Subsidiaries, Inc.**

| | 2026 | 2027 | 2028 | 2029 | 2030 |
|---|---|---|---|---|---|
| Containers Sales to HW Distribution | $1,057,800.00 | $1,163,580.00 | $1,256,666.40 | $1,382,333.04 | $1,520,566.34 |
| Commission on Pallet Sales by HW Distribution | 440,640.00 | 506,736.00 | 557,409.60 | 613,150.56 | 674,465.62 |
| Total Revenue | $1,498,440.00 | $1,670,316.00 | $1,814,076.00 | $1,995,483.60 | $2,195,031.96 |
| Payroll | $338,082.57 | $354,986.70 | $372,736.03 | $391,372.84 | $410,941.48 |
| Payroll Taxes | 25,344.45 | 30,413.34 | 36,496.01 | 38,320.81 | 40,236.85 |
| Affiliate Officer Compensation | 245,192.19 | 257,451.80 | 270,324.39 | 283,840.61 | 298,032.64 |
| Affiliate Officer Compensation - Payroll Taxes | 24,384.63 | 25,603.86 | 26,884.05 | 22,707.25 | 23,842.61 |
| Payroll Processing and Work Comp. | 7,751.49 | 8,139.06 | 8,546.02 | 8,973.32 | 9,421.98 |
| China Office Expenses | 120,000.00 | 123,600.00 | 127,308.00 | 131,127.24 | 135,061.06 |
| China Travel Expenses | 30,000.00 | 31,500.00 | 33,075.00 | 34,728.75 | 36,465.19 |
| Utilities/Internet | 6,000.00 | 6,425.00 | 6,850.00 | 7,275.00 | 7,700.00 |
| Telephone | 12,000.00 | 12,240.00 | 12,484.80 | 12,734.50 | 12,989.19 |
| US Office Overhead | 48,000.00 | 52,000.00 | 56,000.00 | 60,000.00 | 64,000.00 |
| Sales, Marketing and US Travel Expenses | 100,000.00 | 110,000.00 | 121,000.00 | 133,100.00 | 146,410.00 |
| Computer Software/Technology Stack | 6,000.00 | 6,300.00 | 6,615.00 | 6,945.75 | 7,293.04 |
| NetSuite | 15,000.00 | - | - | - | - |
| QBO | 1,800.00 | 1,926.00 | 2,060.82 | 2,205.08 | 2,359.43 |
| Legal fees | 100,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 |
| Loan Payment - PNC | 360,000.00 | 360,000.00 | 360,000.00 | 360,000.00 | 360,000.00 |
| Insurance (Auto, Liability, Property, etc) | 24,000.00 | 30,000.00 | 32,500.00 | 35,000.00 | 37,500.00 |
| Total Expenses | 1,463,555.33 | 1,415,585.76 | 1,477,880.12 | 1,533,331.13 | 1,597,253.46 |
| Net Cash Flow Before | 34,884.67 | 254,730.24 | 336,195.88 | 462,152.47 | 597,778.50 |
| Taxes | 44,511.13 | 134,750.02 | 168,581.57 | 219,211.11 | 273,784.64 |
| Unsecured Annual Payment | 20,000.00 | 30,000.00 | 40,000.00 | 50,000.00 | 60,000.00 |
| Net Cash Flow Before Payment to PNC | (29,626.46) | 89,980.22 | 127,614.30 | 192,941.35 | 263,993.85 |
| Payment to PNC - 50% of Net Cash Flow | | 44,990.11 | 63,807.15 | 96,470.68 | 131,996.93 |
| Net Cash Flow | (29,626.46) | 44,990.11 | 63,807.15 | 96,470.68 | 131,996.93 |
| | | | | | |
| PNC Principal | 92,290.00 | 109,459.00 | 119,430.00 | 130,310.00 | 142,180.00 |
| PNC Interest | 267,710.00 | 250,541.00 | 240,570.00 | 229,690.00 | 217,820.00 |
| | 360,000.00 | 360,000.00 | 360,000.00 | 360,000.00 | 360,000.00 |
| | | | | | |
| Tax Calculation | | | | | |
| Net Cash Flow | 34,884.67 | 254,730.24 | 336,195.88 | 462,152.47 | 597,778.50 |
| PNC Principal | 92,290.00 | 109,459.00 | 119,430.00 | 130,310.00 | 142,180.00 |
| Net Income | 127,174.67 | 364,189.24 | 455,625.88 | 592,462.47 | 739,958.50 |
| | | | | | |
| Income Taxes | 44,511.13 | 134,750.02 | 168,581.57 | 219,211.11 | 273,784.64 |